UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALBERTO G. TREJO,

|  |  |
|---|---|
| Plaintiff, | CIVIL ACTION NO. 10-12051 |
| v. | DISTRICT JUDGE DENISE PAGE HOOD |
| COMMISSIONER OF<br>SOCIAL SECURITY, | MAGISTRATE JUDGE MARK A. RANDON |
| Defendant. | |

_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## I.    PROCEDURAL HISTORY

### A.    *Proceedings in this Court*

On May 21, 2010, Plaintiff filed the instant suit seeking judicial review of the Commissioner's decision disallowing benefits (Dkt. No. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(b)(3), this matter was referred to the undersigned for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for a period of disability, Disability Insurance and Supplemental Security Income benefits (Dkt. No. 3). This matter is currently before the Court on cross-motions for summary judgment (Dkt. Nos. 12, 15).

### B.    *Administrative Proceedings*

Plaintiff filed the instant claims on November 16, 2005, alleging that he became unable to work on September 7, 2005 (Tr. 9, 41-46). The claim was initially disapproved by the Commissioner on February 27, 2006 (Tr. 9, 35-38). Plaintiff requested a hearing and on May 7, 2008, Plaintiff appeared with counsel before Administrative Law Judge (ALJ) B. Lloyd Blair, who

considered the case *de novo*.  In a decision dated May 23, 2008, the ALJ found that Plaintiff was not disabled (Tr. 6-18).  Plaintiff requested a review of this decision on July 23, 2008 (Tr. 5A).  The ALJ's decision became the final decision of the Commissioner when, after the review of additional exhibits[1] (AC-1, Tr. 5), the Appeals Council, on April 27, 2010, denied Plaintiff's request for review (Tr. 2-4).

In light of the entire record in this case, I find that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled.  Accordingly, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

**STATEMENT OF FACTS**

### A.    ALJ Findings

Plaintiff was 37 years old on his alleged disability onset date (Tr. 15).  Plaintiff has past relevant work as a laborer and fast food worker (Tr. 15).  The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since September 7, 2005 (Tr. 11).  At step two, the ALJ found that Plaintiff had the following "severe" impairments: obesity, degenerative disc disease and status post two back surgeries.  *Id*.  At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations (Tr. 13).  Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity (RFC) to "lift or carry a maximum of 20

---

[1] In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review.  *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).  Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ.  In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

pounds occasionally and 10 pounds frequently.  In an eight-hour workday, [Plaintiff] can stand or walk for three hours and sit for five hours.  He needs the option to sit or stand at will. [Plaintiff] should never use ladders, scaffolds or ropes.  He should only occasionally use ramps or stairs, stoop or kneel. [Plaintiff] should avoid walking on uneven surfaces.  He should do no commercial driving. [Plaintiff] should not use a left foot pedal" (Tr. 13).  At step four, the ALJ found that Plaintiff could not perform his previous work as a laborer or fast food worker.  *Id.*  At step five, the ALJ denied Plaintiff benefits, because the ALJ found that Plaintiff could perform a significant number of jobs available in the national economy, such as parking attendant (1,000 positions in Michigan), bench assembler (8,000 positions in Michigan), checker/packer (8,000 positions in Michigan) or security monitor (2,000 positions in Michigan) (Tr. 15-16).

###### B.    *Administrative Record*

####### 1.    **Plaintiff's Testimony and Statements**

At the time of the hearing, Plaintiff was 39 year old (Tr. 183).  Plaintiff had four children aged 11, 10, 6, and 3 (Tr. 191).  Plaintiff stated that he lived with his girlfriend of 14 years (Tr. 191). When Plaintiff initially applied for benefits, he saw his back injury as temporary (Tr. 65). Plaintiff believed that he would be able to return to work in a few months and said that his doctors told him to walk for physical therapy (Tr. 65).  Accordingly, Plaintiff indicated "thats [sic] what I do for most of the day" (Tr. 65).

Plaintiff testified that, at the time of the hearing, he had not been engaged in any formal physical therapy for about 9 months (Tr. 191).  Plaintiff did not think that physical therapy helped him to get better, but said that it did provide exercises that helped relieve his pain (Tr. 189). Detailing his daily activities, Plaintiff reported that he changed laundry loads, but did not carry baskets (Tr. 192); vacuumed (Tr. 192); weeded the garden (Tr. 192), climbed stairs, but with

difficulty (Tr. 192); regularly walked the path at the college across the street (Tr. 193); and watched his daughter (Tr. 198).

Plaintiff described his back pain as pain in his lower back that shoots down his left leg to his feet (Tr. 190). Plaintiff said that he took Vicodin but did not experience any side effects from the medication (Tr. 191). Although Plaintiff reported that he was depressed, he testified that he was not seeing anyone for depression and was not taking an anti-depressant (Tr. 200). Plaintiff testified that he could bend over to pick up a dollar bill, but it would be difficult for him to squat (Tr. 192). Plaintiff stated that he could lift 15 pounds and walk about 4 blocks before having to sit down (Tr. 193), and that he could sit for 30 minutes before having to get up (Tr. 194).

### 2. Medical Evidence

Plaintiff's medical records began shortly after he injured his back in 2005 with treatment notes from Ithaca Family Practice health care providers: Dr. Don Prouty, M.D. and Cathy Chimo, P.A. (Tr. 148-49). Throughout this time, Plaintiff complained that his condition worsened but had some improvement following a visit to the ER (Tr. 148-49). On September 23, 2005, Ms. Chimo referred Plaintiff to the ER for further evaluation (Tr. 148). At the ER, Plaintiff received an MRI that demonstrated a "sizeable extrusion/herniation of the L4-5 disc" and "significant spinal canal stenosis" (narrowing of the spinal canal) (Tr. 148, 153). The ER prescribed Valium, Lortab, and prednisone (Tr. 148).

Following his visit to the ER, on September 26, 2005, Plaintiff reported that his pain was "under better control" and that he was able to walk better (Tr. 148). Dr. Prouty noted a minimal limp (Tr. 148). Dr. Prouty found that Plaintiff was able to laterally bend and extend without any difficulty (Tr. 148). Based on a referral from the ER, Plaintiff saw Dr. Schell at Saginaw Valley Neurosurgery for an evaluation on October 17, 2005 (Tr. 124). Dr. Schell reviewed the September MRI noting a

very large disc herniation at the L4-5 level with cauda equina syndrome (compression of the nerve roots below the spinal cord) and severe lumbar spinal canal stenosis (Tr. 83, 124). Upon physical examination, Dr. Schell reported that Plaintiff had some minor dorsiflexor weakness in his left foot but otherwise did not have any major neurologic deficit (Tr. 124).

A few days later, on October 20, 2005, Dr. Schell performed a physical exam, immediately prior to surgery (Tr. 85-86). During the exam, Plaintiff reported taking Lortab and Valium for pain and said he smoked six marijuana cigarettes per month (Tr. 85-86). Dr. Schell found a positive straight-leg raise test at 30 degrees (Tr. 86). Following the physical exam, Dr. Schell performed a complete laminectomy at L5 and a partial laminectomy at L4 (Tr. 83). He also removed a large disc fragment (Tr. 83). Postoperatively, Plaintiff's strength in his legs improved and there was some resolution in numbness (Tr. 82). Plaintiff made "pretty good progress" before being discharged from the hospital (Tr. 82).

Plaintiff went for post-surgery follow-up on November 15, 2005 (Tr. 123). Steve Lackie, a Physician Assistant with Saginaw Valley Neurosurgery, examined Plaintiff and found him to be "doing well" except for substantial fluid accumulation in his back underneath the incision site (Tr. 123). Plaintiff reported that "he really feels very good and has very little pain except for in the incisional area" (Tr. 123). Mr. Lackie wanted Plaintiff to return to check on the fluid accumulation (Tr. 123). Mr. Lackie also noted that Plaintiff needed to gradually increase his activities and be cautious about doing landscape-type work until he was re-examined (Tr. 123).

When Plaintiff returned on November 22, 2005, for follow-up to check on the fluid accumulation in his back, Dr. Schell ordered a CT scan (Tr. 125). The CT scan showed Plaintiff's recent laminectomies as well as the subcutaneous fluid collection (Tr. 125). The CT also showed a bulging annulus at L4-5 with a large residual or recurrent right paracentral L5-S1 herniated nucleus

pulposus which may impinge on the right S1 nerve root (Tr. 125). The CT scan report noted that further MRI evaluation may be appropriate (Tr. 125). The same day, Dr. Schell operated on Plaintiff to aspirate the fluid in his back (Tr. 77-78, 81).

After his second surgery, Plaintiff returned to see Mr. Lackie for staple removal on December 5, 2005 (Tr. 75). Plaintiff reported that he was doing somewhat better and that his pain was a little better (Tr. 75). On December 29, 2005, Plaintiff returned for follow-up with Mr. Lackie because he noticed drainage from the incision (Tr. 74). Mr. Lackie found two small areas of suture granuloma and was able to remove the suture without difficulty (Tr. 74).

On January 10, 2006, Plaintiff had x-rays taken of his back (Tr. 76). Dr. Roger Hynes, M.D., compared the x-rays to Plaintiff's September 16, 2005 x-ray (Tr. 76). He noted the laminectomy could be seen at L5 (Tr. 76). There were mild scoliotic changes, which might be positional (Tr. 76). Dr. Hynes observed mild degenerative changes as well as nonspecific straightening of the spine (Tr. 76).

On January 16, 2006, Mr. Lackie re-examined Plaintiff (Tr. 73). Mr. Lackie wrote a letter to Plaintiff's family practice doctor, Dr. Prouty, reporting that "[Plaintiff] is actually doing quite well" (Tr. 73). Plaintiff increased his weight lifting to 10 pounds (Tr. 73). Mr. Lackie reported that the accumulation of fluid was "almost completely gone" (Tr. 73). Mr. Lackie recommended monthly physical therapy and that Plaintiff consider a different profession because as a landscape assistant he was on his feet a lot and doing a lot of mowing (Tr. 73).

Two weeks later, Dr. Prouty performed a physical examination of Plaintiff (Tr. 99). At this visit, Plaintiff reported that he purchased a fitness membership at a local college so that he could begin a walking program (Tr. 99). Dr. Prouty recommended exercise, weight loss, and decreased consumption of soda, fast food, and pre-packaged food (Tr. 99).

The record does not contain any treatment records for the next several months. Beginning in June 2006, Plaintiff started seeing Dr. Daniel Duffy, D.O., at Physical Medicine and Rehabilitation.  At his first visit, on June 12, 2006, Plaintiff reported that he attended 12 physical therapy sessions that worked mostly on shoulder strength, shoulder movement, and some hip movement, but did not involve any stretching or working out for his back (Tr. 88).  Upon physical examination, Dr. Duffy found Plaintiff had "stiffness in his low back" and decreased muscle tone in his calf and hamstrings but normal muscle tone in his quadriceps (Tr. 89). Plaintiff's straight-leg raise tests were negative (Tr. 89).  Dr. Duffy reviewed an earlier MRI of Plaintiff's back and noted that although there was no longer a disc herniation at the L4-5 level there appeared to be a herniation at the L5-S1 region (Tr. 89).  Dr. Duffy recommended a new MRI and an EMG (electromyography) to evaluate Plaintiff's nerve function (Tr. 89).

A couple weeks later, on June 26, 2006, Dr. Duffy performed the EMG and repeated the MRI (Tr. 90).  Upon a repeat of the MRI, Dr. Duffy found that Plaintiff "luckily" had no disc herniations (Tr. 90).  There was some disc desiccation at the L5-S1 level (Tr. 90).  Based on the MRI and EMG results, Dr. Duffy believed that Plaintiff had cauda equina syndrome but found no evidence of symmetric peripheral neuropathy (a condition that results when nerves that connect to the brain and spinal cord from the rest of the body are damaged or diseased) (Tr. 90).

On August 14, 2006, Plaintiff returned to see Dr. Duffy (Tr. 91).  Plaintiff reported that he had been in physical therapy and was getting stronger in his abdomen, core, and hips (Tr. 91). Plaintiff reported that physical therapy "has been successful" (Tr. 91).  Plaintiff had no reflexes in his Achilles but normal reflexes in his quadriceps (Tr. 91).  Plaintiff had some weakness in legs (Tr. 91).  Dr. Duffy noted that Plaintiff was possibly starting to display signs of chronic pain syndrome (Tr. 91).

In the Fall of 2006, Plaintiff's back problems were improving.  On September 13, 2006, Plaintiff told Dr. Duffy that he was looking for a job, but was unsure if he would be able to find one (Tr. 92).  Dr. Duffy instructed Plaintiff to avoid jobs with heavy lifting or twisting (Tr. 92). On October 11, 2006, Plaintiff reported that the sleeping medication prescribed by Dr. Duffy "helped him really tolerate his pain a lot better" (Tr. 93).  Dr. Duffy and Plaintiff planned for Plaintiff to continue with his current program of exercise, physical therapy, intermittent use of narcotics, and good sleep (Tr. 93). On December 6, 2006, Plaintiff had been in therapy for a month-and-a-half (Tr. 94).  Dr. Duffy noticed that Plaintiff walked better (Tr. 94).  Plaintiff's back mobility was "slightly restricted but probably functional" (Tr. 94).  Plaintiff reported no leg weakness or "give-outs" (Tr. 94).  Plaintiff's pain was causing some depression, but there was marked improvement in that area (Tr. 94).  Plaintiff was off Restoril and Vicodin (Tr. 94).  Dr. Duffy thought that Plaintiff would be able to get back to work sometime (Tr. 94).  He thought

Plaintiff would never be able to return to heavy duty jobs, but that with good pain treatment and good mobility, he would be able to perform more sedentary jobs (Tr. 94).

On February 28, 2007, Plaintiff told Dr. Duffy that he had not been going to therapy and he attended therapy only five times in the last year (Tr. 95).  According to Plaintiff, his therapy provider discharged him because he never called to schedule therapy (Tr. 95).  Dr. Duffy's February 26, 2007 report focused on Plaintiff's subjective complaints of weakness and lack of muscle control (Tr. 95).  Dr. Duffy's physical examination found weakness in his right lower extremity with a "little bit" of foot drop (Tr. 95).  Dr. Duffy's plan for Plaintiff included once-a-day non-steroidal anti-inflammatory medicine (Tr. 95).  Dr. Duffy also commented that Plaintiff could not work with the combination of medical and psychological problems "that he has today" (Tr. 95).

On March 9, 2007, Plaintiff underwent another MRI of his back (Tr. 72). Dr. Philip Trover, M.D. reviewed the MRI results (Tr. 72). Dr. Trover found no significant disc bulge or protrusion (Tr. 72). Dr. Trover noted moderate spinal canal stenosis at the L4 level as well as well as small fluid collection in that area, but noted that it was stable and unchanged compared to a previous exam on June 17, 2006 (Tr. 72).

Dr. Duffy completed an assessment of Plaintiff's ability to do work-related activities on March 28, 2007 (Tr. 96-98). As part of the assessment, he diagnosed Plaintiff with herniated disc, radiculopathy (nerve irritation caused by damage to the discs between the vertebrae), and depression (Tr. 98). Dr. Duffy determined that Plaintiff was capable of lifting 20 pounds; standing or walking for 3 hours in an 8-hour day, 30 minutes without interruption; and sitting for 3-4 hours, 90 minutes without interruption (Tr. 96). Dr. Duffy opined that Plaintiff could occasionally kneel, reach, handle, push/pull, and bend, but that Plaintiff could never climb, balance, stoop, crouch or crawl (Tr. 97). Dr. Duffy noted that Plaintiff must be able to escape harm from moving machinery (Tr. 97). Dr. Duffy also indicated that Plaintiff would need to take additional rest breaks (Tr. 98).

On June 20, 2007, Plaintiff underwent another MRI (Tr. 70). Dr. Duffy reviewed the MRI results and reported that Plaintiff "use[d] to have L5-S1 herniated disk" but that it "appear[ed] to have resolved" (Tr. 70). Dr. Duffy indicated degenerative changes to the L4-L5 disc and found that Plaintiff continued to have cauda equina syndrome (Tr. 70). Dr. Duffy noted that Plaintiff was not taking any medications for his back pain (Tr. 70). Plaintiff stated that he preferred not to use medicines if at all possible (Tr. 70). Dr. Duffy's examination demonstrated leg weakness and atrophy but no noticeable changes in Plaintiff's quadriceps (Tr. 70). Dr. Duffy related that Plaintiff was no longer taking anti-depressants, but was managing his depression through exercise, which seemed to help (Tr. 70).

Plaintiff returned to see Dr. Duffy on October 10, 2007 (Tr. 69).  Plaintiff said that he "is never taking medications" and that he "did not really give them a chance" (Tr. 69). Plaintiff also reported that he was not exercising as much (Tr. 69).  Plaintiff complained that his pain was as bad as ever, but he had no goals (Tr. 69).  Upon physical examination of Plaintiff, Dr. Duffy did not find residual weakness in Plaintiff's legs and rated his leg strength at 5/5 (Tr. 69).  Dr. Duffy further commented on Plaintiff's poor effort (Tr. 69).

Three months later, on January 2, 2008, Plaintiff returned to Dr. Duffy (Tr. 68).  Plaintiff's main goal was to keep up with his family (Tr. 68).  Plaintiff also said that he was starting to enjoy life more and that he was taking things into his own hands (Tr. 68).  Plaintiff continued to report back pain and stiffness (Tr. 68).

Plaintiff's last reported visit with Dr. Duffy was on January 30, 2008 (Tr. 67).  Plaintiff continued to complain of back pain and rated his current pain level at 7 out of 10, 9 at its worst, and 5 at its best (Tr. 67).  Plaintiff reported that he took two Vicodin only infrequently, for example if he wanted to go shopping with his whole family (Tr. 67). Plaintiff said that he planned to use 30 Vicodin, at most, per month (Tr. 67).

### C.    *Plaintiff's Claims of Error*

Plaintiff raises four arguments on appeal: (1) that the ALJ failed to give controlling weight to Plaintiff's treating physician, Dr. Duffy; (2) that the ALJ failed to properly consider whether Plaintiff's back condition met or equaled a "listed impairment;" (3) that the ALJ failed to properly evaluate Plaintiff's credibility; and (4) that the ALJ failed to heed the testimony of the Vocational Expert concerning Dr. Duffy's opinion.

## III.    DISCUSSION

### A.    *Standard of Review*

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious. *See Sullivan v. Zebley*, 493 U.S. 521 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *See Bowen v. Yuckert*, 482 U.S. 137 (1987). If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may...consider the credibility of a claimant when making a determination of disability."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, particularly since the ALJ is charged with observing the claimant's demeanor

-11-

and credibility.") (quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to

a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's

testimony, and other evidence.").  "However, the ALJ is not free to make credibility determinations

based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486

F.3d at 247, quoting, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

   If supported by substantial evidence, the Commissioner's findings of fact are conclusive.  42

U.S.C. § 405(g).  Therefore, this Court may not reverse the Commissioner's decision merely because

it disagrees or because "there exists in the record substantial evidence to support a different

conclusion."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v.*

*Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).  Substantial evidence is "more than a scintilla

of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475.  "The

substantial evidence standard presupposes that there is a 'zone of choice' within which the

Commissioner may proceed without interference from the courts."  *Felisky v. Bowen*, 35 F.3d 1027,

1035 (6th Cir. 1994) (citations omitted), citing, *Mullen*, 800 F.2d at 545.

   The scope of this Court's review is limited to an examination of the record only.  *See Bass*,

499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  When reviewing the

Commissioner's factual findings for substantial evidence, a reviewing court must consider the

evidence in the record as a whole, including that evidence which might subtract from its weight.  *See*

*Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  "Both the court of

appeals and the district court may look to any evidence in the record, regardless of whether it has

been cited by the Appeals Council."  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir.

2001).  There is no requirement, however, that either the ALJ or the reviewing court must discuss

every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed.Appx. 521, 526 (6th Cir. 2006).


### B.    Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits."  *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. Appx. 515, 524 (6th Cir. 2003).  There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq*.) and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et seq*.). Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled.  F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984).  While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'"  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments, that "significantly limits...physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534.  "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates."  *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by his impairments and the fact that he is precluded from performing his past relevant work."  *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540.  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner.  *See Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors."  *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

**C.    *Analysis and Conclusions***

-14-

As noted above, Plaintiff raises four arguments on appeal, namely: (1) that the ALJ failed to give controlling weight to Plaintiff's treating physician, Dr. Duffy; (2) that the ALJ failed to properly consider whether Plaintiff's back condition met or equaled a "listed impairment;" (3) that the ALJ failed to properly evaluate Plaintiff's credibility; and (4) that the ALJ failed to heed the testimony of the Vocational Expert concerning Dr. Duffy's opinion. Each argument is discussed below. Argument four is directly related to argument one, so both of these arguments will be discussed in the section one, below.

### 1.   The ALJ Correctly Discounted Dr. Duffy's Opinion

Plaintiff first argues that the ALJ did not give proper weight to Dr. Duffy, one of his treating physicians. The ALJ found that Dr. Duffy's opinion was neither supported by sufficient clinical findings nor consistent with the evidence (Tr. 14). Defendant avers that the ALJ correctly assessed Dr. Duffy's opinion and that Plaintiff's complaints of back pain were inconsistent with Plaintiff's infrequent use of pain medications and daily activities (Tr. 14). Defendant further avers that Dr. Duffy's opinion was not consistent with clinical findings. Defendant is correct. Among other evidence, the ALJ pointed to a report from Mr. Lackie, a physician assistant who examined Plaintiff on several occasions before and after his surgeries (Tr. 14). Mr. Lackie noted in January 2006 that "[Plaintiff] is actually doing quite well," and had increased his weight lifting to 10 pounds (Tr. 73).

Defendant also correctly points out that Dr. Duffy's opinion was not consistent with his own clinical findings and observations. Dr. Duffy based his opinion regarding Plaintiff's work restrictions on his diagnoses for Plaintiff – herniated disc, radiculopathy, and depression (Tr. 98). However, an MRI earlier that month revealed no significant disc abnormalities (Tr. 72). Furthermore, three months later, Dr. Duffy himself confirmed that Plaintiff no longer had any herniated discs (Tr. 70). In the fall of 2006, when Plaintiff informed Dr. Duffy that he was looking for a job, the only

restrictions given by Dr. Duffy were to avoid jobs with heavy lifting or twisting (Tr. 92). Notably, Dr. Duffy did not restrict Plaintiff from all work. In December 2006, after examining Plaintiff, Dr. Duffy said that although Plaintiff could never return to heavy duty jobs, he may be able to perform more sedentary jobs (Tr. 94).

The issue of whether Plaintiff is disabled within the meaning of the Social Security Act is reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *see also Gaskin v. Comm'r of Soc. Sec.*, 280 F. App'x 472, 474 (6th Cir. 2008). "Generally, the opinions of treating physicians are given substantial, if not controlling deference." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). A treating physician's opinion is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see Cox v. Comm'r of Soc. Sec.*, 295 F. App'x 27, 35 (6th Cir. 2008) ("This court generally defers to an ALJ's decision to give more weight to the opinion of one physician than another, where, as here, the ALJ's opinion is supported by evidence that the rejected opinion is inconsistent with the other medical evidence in the record."). The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *see also Kidd v. Comm'r of Soc. Sec.*, 283 F. App'x 336, 340 (6th Cir. 2008). An opinion that is based on Plaintiff's reporting of his symptoms is not entitled to controlling weight. *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876-77 (6th Cir. 2007).

Considering the evidence of record as a whole, the ALJ reasonably found that Plaintiff could perform a significant range of light work and correctly discounted Dr. Duffy's opinion. Thus, I find

no merit in Plaintiff's first argument on appeal.  Additionally, since the ALJ acted reasonably in

discrediting Dr. Duffy's opinion, Plaintiff's citation to the VE's testimony concerning Dr. Duffy's

opinion is immaterial (Pl's Br. at 11-12).  Thus, Plaintiff's fourth argument on appeal also fails.

### 2.    The ALJ Correctly Found That Plaintiff Did Not Satisfy Listing 1.04

Plaintiff next argues that the ALJ erred in not finding that Plaintiff satisfied Listing 1.04,

subsection A, which provides:

> 1.04  Disorders of the spine  (*e.g.*, herniated nucleus pulposus, spinal
> arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis,
> vertebral fracture), resulting in compromise of a nerve root (including the cauda
> equina) or the spinal cord. With:

> A. Evidence of nerve root compression characterized by neuro-anatomic
> distribution of pain, limitation of motion of the spine, motor loss (atrophy with
> associated muscle weakness or muscle weakness) accompanied by sensory or reflex
> loss and, if there is involvement of the lower back, positive straight-leg raising test
> (sitting and supine);

> 20 C.F.R. Part 404, Subpart P, App. 1, § 1.04(A).

Defendant responds that, although Plaintiff satisfied some requirements of Listing 1.04A, he failed

to establish at least one of the requirements – the positive straight-leg raise test. To satisfy the

Listing, the straight-leg raise test must be positive in both the seated and supine positions. Defendant

further points out that, "[b]ecause abnormal physical findings may be intermittent, their presence

over a period of time must be established by a record of ongoing management and evaluation." 20

C.F.R. Part 404, Subpart. P. App. 1, § 1.00(D).  That a claimant satisfied the elements of a Listing

for a moment in time or for some brief period is insufficient to establish a Listing-level impairment

as Listings without an explicit duration requirement have an implicit 12-month duration requirement.

*See* 20 C.F.R.§ 404.1525(c)(4); *McCoy v. Chater*, 81 F.3d 44, 46 (6th Cir. 1995).

Defendant's argument is well-taken.  Plaintiff failed to establish positive straight-leg tests

"over a period of time" let alone over the requisite 12-month duration.  Plaintiff had only one

positive straight-leg test result, and it occurred immediately prior to Plaintiff's first surgery (Tr. 86, 139). In the time frame between Plaintiff's back injury and his surgeries, Plaintiff had three other straight-leg raise tests, none of which satisfied Listing 1.04A. Plaintiff's other straight-leg raise tests did not satisfy Listing 1.04A as one was positive in the supine position, but negative in the sitting position (Tr. 149); on the other two tests, Plaintiff's straight-leg raising was "limited" (Tr. 149) or "restricted" (Tr. 148), but the results were not described as positive. A positive result requires more than limitation or restriction in straight leg raising, it requires that the test produce specific radicular symptoms. Neither of these tests suggested such symptoms were present.

Furthermore, even if these straight-leg raise tests were "positive," Plaintiff only presented tests that occurred within a short two-month time frame surrounding his back injury and resulting surgeries (Tr. 86, 148-48). Plaintiff failed to present any evidence of positive straight-leg raise tests that occurred following his surgeries. In fact, six months after Plaintiff's back surgeries, Dr. Duffy repeated the straight-leg raise tests for Plaintiff and explicitly said they were negative (Tr. 89). As such, Plaintiff has failed to establish that his back condition met or equaled Listing 1.04, subsection A.

### 3.      The ALJ Correctly Assessed Plaintiff's Credibility

Plaintiff next challenges the ALJ's credibility determination. Plaintiff takes issue with only two of the ALJ's considerations – Plaintiff's minimal and sporadic use of pain relievers and Plaintiff's daily activities – asserting that the ALJ took evidence regarding these factors out of context. Defendant responds that it was entirely proper for the ALJ to consider Plaintiff's infrequent and sporadic use of pain medications and daily activities when assessing the credibility of Plaintiff's statements. Defendant is correct. Social Security regulations require ALJs to consider daily activities as well as type, dosage, effectiveness, and side effects of pain medication when evaluating

the credibility of a claimant's allegations regarding his symptoms.  *See* 20 C.F.R. §§ 404.1529(c)(3)(I) and (iv).  Furthermore, the Sixth Circuit has found that failing to take any pain medication or taking mild dosages of pain medication can be judged inconsistent with an allegation of pain that is so disabling that it precludes any level of work.  *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("Further, Mr. Blacha's use of only mild medication (aspirin) undercuts complaints of disabling pain"); *Maher v. Sec'y of Health & Human Servs.*, 898 F.2d 1106, 1109 (6th Cir. 1989) ("Mild medications taken by a claimant do not bear out allegations of severe disabling pain.").

It also appears that the ALJ's discussion of Plaintiff's intermittent use of pain medication was entirely consistent with the record (Tr. 14).  The ALJ correctly noted that Plaintiff made repeated statements that he took prescription Vicodin only occasionally (Tr. 67) (Plaintiff told Dr. Duffy he only took Vicodin infrequently).  The ALJ also correctly noted that Plaintiff reported at times he took no medications at all (Tr. 69) (Plaintiff said he "is never taking medications" and he "did not really give them a chance"), (Tr. 70) (Dr. Duffy noted that Plaintiff was not taking any medications for his back), (Tr. 94).  In sum, the ALJ correctly noted Plaintiff's infrequent use of pain medication and this fact is one that the ALJ was entitled to rely upon when assessing Plaintiff's credibility and subjective complaints of pain.

Plaintiff's daily activities also support the ALJ's findings regarding Plaintiff's credibility.  The ALJ noted that Plaintiff was "capable of a wide range of activities of daily living."  Plaintiff argues that the ALJ erred by mention of some of Plaintiff's activities, while failing to discuss Plaintiff's limitations in those activities (Pl's Br. at 10).  However, an ALJ's decision is not subject to reversal merely because there is also evidence to the contrary. See *White v. Comm'r of Social Sec.*, 572 F.3d 272, 281-282 (6th Cir. 2009).  Plaintiff does not refute that he drives twice per week and

watches his children.  Moreover, Plaintiff further testified that his daily activities also included changing laundry loads; vacuuming; weeding the garden; climbing stairs, but with difficulty; and regularly walking the path at the college across the street (Tr. 192-93).  The ALJ was entitled to rely upon this testimony when assessing Plaintiff's credibility, and it does not appear that the ALJ mischaracterized Plaintiff's testimony concerning his daily activities.

This Court does not make its own credibility determinations.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997); *see also Lawson v. Comm'r of Soc. Sec.*, 192 F. App'x 521, 528 (6th Cir. 2006).  The Court cannot substitute its own credibility determination for the ALJ's. The Court's "review of a decision of the Commissioner of Social Security, made through an administrative law judge, is extremely circumscribed ...." *Kuhn v. Comm'r of Soc. Sec.*, 124 F. App'x 943, 945 (6th Cir. 2005).  The Commissioner's determination regarding the credibility of a claimant's subjective complaints is reviewed under the deferential "substantial evidence" standard.  "Claimants challenging the ALJ's credibility determination face an uphill battle."  *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 488 (6th Cir. 2005).  "Upon review, [the court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *see also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007).

In the present case, the ALJ provided a detailed and lengthy discussion of his reasons for finding that Plaintiff's subjective complaints were not fully credible.  Simply put, I find that the ALJ's credibility determination is supported by substantial evidence.  *See Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990); *see also Infantado v. Astrue*, 263 F. App'x 469, 475-76 (6th Cir. 2008).

-20-

## III.    RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, that Defendant's motion for summary judgment be **GRANTED** and that the findings and conclusions of the Commissioner be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court.  The response shall address  each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon
MARK A. RANDON
UNITED STATES MAGISTRATE JUDGE

Dated:  June 27, 2011

-21-

<u>*Certificate of Service*</u>

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, June 27, 2011, by electronic and/or ordinary mail.*

<u>*s/Melody R. Miles*</u>
*Case Manager to Magistrate Judge Mark A. Randon*
*(313) 234-5542*